UNITED STATES, Appellee

v.

Allen L. PHILLIPS, Jr. Specialist
U.S. Army, Appellant.

No. 94–0359.
CMR No. 9200239.

U.S. Court of Appeals for
the Armed Forces.

Argued Feb. 16, 1995.

Decided Sept. 13, 1995.

For Appellant: *Captain Matthew A. Myers* (argued); *Colonel Stephen D. Smith, Major Fran W. Walterhouse, Captain Victor*

A. *Tall* (on brief); *Lieutenant Colonel John T. Rucker.*

For Appellee: *Captain John G. Giovannelli* (argued); *Colonel John M. Smith, Lieutenant Colonel James L. Pohl, Captain Michael E. Mulligan* (on brief).

### Opinion of the Court

CRAWFORD, Judge:

1. Pursuant to his pleas, appellant was convicted of absence without leave (11 days), conspiracy to distribute cocaine,[1] possession of cocaine, and distribution of cocaine, in violation of Articles 86, 81, and 112a, Uniform Code of Military Justice, 10 USC §§ 886, 881, and 912a, respectively. The convening authority approved the sentence of a bad-conduct discharge, 20 months' confinement, total forfeitures, and reduction to the lowest enlisted grade. The Court of Military Review[2] affirmed the findings and sentence. 38 MJ 641 (1993). We specified the following issue for review:

> WHETHER THERE WAS INEFFECTIVE ASSISTANCE OF COUNSEL DUE TO COUNSEL'S FAILURE TO ADMIT THE *CHAPLAIN'S HANDBOOK,* FOR WHICH THE JUDGE ALLOWED 48 HOURS, AND THE WICCA[N] BIBLE, WHICH WAS APPARENTLY REASONABLY OBTAINABLE.

We hold that defense counsel was not ineffective in failing to move the admission of the *Chaplain's Handbook* and the Wiccan Bible.

### FACTS

2. After hearing evidence during sentencing,[3] the military judge held a post-trial session under Article 39(a), UCMJ, 10 USC § 839(a), to address the allegations of illegal pretrial punishment by denial of appellant's right to "religious practice." During this session appellant alleged that he was not permitted access to the Wiccan Bible during his pretrial confinement in a civilian jail. Appellant's First Sergeant testified that appellant was denied the Bible by the head jailer because Wicca "wasn't a recognized religious practice in the State of North Carolina."

3. The Court of Military Review in this case stated:

> Wicca is a pagan religion not unlike the ancient Druid faith, believing in the sacredness of Nature. While not involving a belief in, or worship of, Satan, prejudice against Wiccans exists because of popular confusion between witchcraft (which is part of the Wiccan faith) and Satanism. *See* Office of the Chief of Chaplains, Dep't of the Army, Religious Requirements and Practices of Certain Selected Groups: A Handbook for Chaplains (n.d) [not dated].

38 MJ at 642 n. 3. Although appellant's personnel records reflect that he was a Baptist, appellant claimed to have been practicing witchcraft for approximately 14 months.

4. At the hearing the judge asked the defense whether any Army regulations covered religious practices in confinement facilities. The defense responded:

> I think 190–47 is the confinement regulation. I think there's simply a general admonition within that regulation that should attempt to accommodate religious practice. I don't think it gets specific on that. That's just my recollection.

---

1. GCMO 11 dated 11 July 1992 erroneously reflects that appellant was found not guilty of this offense (specification 1 of Charge II). The finding of not guilty as to Charge IV is correct. R. 98.

2. *See* 41 MJ 213, 229 n. * (1994).

3. Appellant made an unsworn statement during sentencing that he asked the First Sergeant about religious materials. He stated, "[T]he jailers wouldn't allow" his girlfriend to bring "all my books about" Wicca.

The First Sergeant testified that appellant told him and the company commander that the jailers refused to "let his girlfriend bring a copy of his book—whatever it was that he wanted in there."
Appellant's girlfriend was asked:
Q. When Specialist Phillips was incarcerated in pretrial confinement down at the Cumberland County Jail, did you attempt to take religious literature to him?
A. Yes. And the literature that I took to—inside the front cover—it's got an AR.
Q. Were you permitted to give that religious literature to him?
A. No, they wouldn't allow it.

5. The judge allowed the defense 48 hours to submit these materials. However, no materials were submitted, and the judge found:

> [T]e accused was denied access to materials concerning the Wiccan religion. However, the defense has presented no evidence whatsoever, except for some sketchy testimony by the accused, concerning the nature of the Wiccan religion, its tenets and practices. I am not convinced by the evidence that the Wiccan religion is in fact a "religion," that is, "the service and worship of the supernatural" (Websters New Collegiate Dictionary). Nor am I convinced that the accused is a devotee of Wiccan practices to any extent such that deprivation of reading materials would have any significant prejudicial effect upon him. In any event, I find that deprivation of such materials was not intended by anyone (Army personnel or Cumberland County Jail personnel) to be pretrial punishment.

Appellate Exhibit (App.Ex.) VIII at 2.

## DISCUSSION

6. The First Amendment right to the free exercise of religion is a preferred and cherished right. *See Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). The freedom to believe may never be infringed within the prison walls. However, the practice of a religion there is subject to reasonable regulations. *Long v. Parker,* 390 F.2d 816, 820 (3d Cir. 1968). While not manacling the right to worship, certain practices may be curbed due to security needs, or insufficient space, time, or resources. We need not in this case determine the exact nature of the right to practice religion and what legitimate governmental interests may limit this right. But we do know that at least religious expression may not include preaching defiance of prison authorities. *Knuckles v. Prasse,* 302 F.Supp. 1036, 1058 (E.D.Pa. 1969), *aff'd,* 435 F.2d 1255 (3d Cir. 1970), *cert. denied,* 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971).

7. An effective counsel obtains credit against a sentence to confinement for the following: pretrial confinement, *United States v. Allen,* 17 MJ 126 (CMA 1984); no assignment of requested counsel, RCM 305(f), Manual for Courts–Martial, United States, 1984; no review of confinement within 48 hours, RCM 305(h)(2), as modified by *United States v. Rexroat,* 38 MJ 292 (CMA 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1296, 127 L.Ed.2d 648 (1994); no review by a neutral officer within 7 days, RCM 305(i)—see RCM 305(k); or violations of Article 13, UCMJ, 10 USC § 813, *United States v. Suzuki,* 14 MJ 491 (CMA 1983). The specified issue concerns effectiveness of counsel in failing to litigate the necessity for *Suzuki* credit for illegal pretrial confinement occurring when appellant was not given a Wiccan Bible.

8. The effectiveness of counsel is determined by a two-pronged test: first, the competence prong, and second, the prejudice prong. *Strickland v. Washington,* 466 U.S. 668, 687, 699, 104 S.Ct. 2052, 2064, 2070–71, 80 L.Ed.2d 674 (1984); *United States v. Loving,* 41 MJ 213, 242–49, ¶¶ 25–42 (1994). In applying the *Strickland* test the Supreme Court has emphasized that "[j]udicial scrutiny of counsel's performance must be highly deferential." 466 U.S. at 689, 104 S.Ct. at 2065. "[C]ounsel is strongly presumed" to have given "adequate assistance." *Id.* at 690, 104 S.Ct. at 2066. The Court warned that "it is all too tempting ... to second-guess" a lawyer's performance and the Court should try "to eliminate the distorting effects of hindsight." *Id.* at 689, 104 S.Ct. at 2065. Acts or admissions by counsel that are strategic or tactical do not lead to a violation of the first prong. The Court in *Strickland* held that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690, 104 S.Ct. at 2066.

9. While the record does not reflect defense counsel's reason for not producing a Wiccan Bible and the pertinent regulations, it is doubtful that these materials would have convinced the judge that appellant suffered pretrial punishment by denial of a so-called Wiccan Bible. In point of fact there is no Wiccan Bible. Instead the ritual text is called *The Book of Shadows.* It is a blank

book in which the pages are copied by hand from one's initiating High Priestess. Dep't of Army Pamphlet 165–13, Religious Requirements And Practices, Chap. VII–39 at 5 (April 1978) (Appendix B of Final Brief). This pamphlet also notes that "[i]ndividual worship is possible, but not generally practiced." Page 2. Additionally, it describes the "Minimum Equipment For Worship: an atheme (ritual knife), a bowl of water, a censer with incense, salt, an altar and 6 candles in candlesticks. A sword and pentacle (talisman) are optional, not widely used. All tools must be ritually consecrated by a High Priestess." Page 3. It is highly doubtful that any confinee would be permitted access to this "minimum equipment for worship" of the Wiccan religion. Indeed it is reasonable to assume that counsel may have investigated producing *The Book of Shadows* and other descriptive materials but decided that it would be counter-productive. Thus, appellant has not carried his burden to show that his counsel was incompetent by not producing these materials.

**▮▮▮ 10.** Even assuming that appellant has met his burden with respect to the first prong of *Strickland,* the issue concerning Article 13 is whether the refusal to furnish the Bible was done with the intent to punish or stigmatize a person awaiting disciplinary disposition. *United States v. Bayhand,* 6 USCMA 762, 21 CMR 84 (1956); *see also Thacker v. United States,* 16 MJ 841 (NMCMR 1983); *United States v. Southers,* 12 MJ 924, 927 (NMCMR 1982).

Article 13 of the Uniform Code of Military Justice provides:

No person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances require to insure his presence, but he may be subjected to minor punishment during that period for infractions of discipline.

**11.** No evidence was introduced at trial that denial of the Bible was intended to punish appellant. The only evidence was

that the jailer erroneously thought that Wicca was not a recognized religion. While the Fourth Circuit (which includes North Carolina) in *Dettmer v. Landon,* 799 F.2d 929 (1986), *cert. denied,* 483 U.S. 1007, 107 S.Ct. 3234, 97 L.Ed.2d 739 (1987), recognized Wicca as a religion, the court went on to hold that it was permissible to exclude from a confinement facility many of the objects utilized in the practice of the Wicca religion. *Cf. Theriault v. Carlson,* 495 F.2d 390 (5th Cir. 1974), *cert. denied,* 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974). In any event, we hold the military judge's findings of fact that there was no intentional punishment were not clearly erroneous. Because we conclude that there was no violation of Article 13, appellant could not have been prejudiced by any deficiency of counsel. Thus, we conclude that the second prong of *Strickland* has not been met.

The decision of the United States Army Court of Military Review is affirmed.

Judges COX and GIERKE concur.

WISS, Judge (concurring in the result):

I

**12.** Several aspects of the provocative issue before this Court are clear. First, Wicca is a socially recognized religion. It is acknowledged as such by the Army. *See* Dept. of the Army (DA) Pamphlet 165–13–1, Religious Requirements and Practices of Certain Selected Groups: A Handbook for Chaplains (April 1980), revising DA Pamphlet 165–13, Religious Requirements and Practices of Certain Selected Groups: A Handbook for Chaplains (April 1978). Further, it is acknowledged as such in courts of law. *See, e.g., Dettmer v. Landon,* 799 F.2d 929 (4th Cir. 1986), *cert. denied,* 483 U.S. 1007, 107 S.Ct. 3234, 97 L.Ed.2d 739 (1987). *Cf. Thomas v. Review Board of The Indiana Employment Security Division,* 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981)("[T]he resolution of that question [whether a belief is a religion] is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consis-

tent, or comprehensible to others in order to merit First Amendment protection."). Unfortunately, the military judge's essential findings following the post-trial session under Article 39(a), Uniform Code of Military Justice, 10 USC § 839(a), reflect that he was unaware that Wicca is a recognized religion, and appellant's defense counsel did nothing to illuminate him.

13. Second, Wicca embraces religious readings, specifically, its "authoritative" book entitled *The Book of Shadows*. The 1978 Chaplains' Handbook says the following of that book:

> In the Gardnerian tradition, these are hand copied from High Priestess to High Priestess. Each High Priestess then shares the information with her coven. They are part of the traditional teachings of the Craft, and are available only to initiates. From coven to coven, the rituals vary slightly. The Gardnerian tradition is an evolved and evolving tradition. Hence, each coven will start with the materials passed on to its High Priestess, and then experiment with new emphases, magical formulas and rituals.

Page 5. The latest version of the Chaplains' Handbook similarly explains:

> Most groups have a handwritten collection of rituals and lore, known as a *Book of Shadows*. Part of the religious education of a new member will be to hand copy this book for him or herself. Over the years, as inspiration provides, new material will be added. Normally, access to these books is limited to initiated members of the religion.

Appendix to Assignment of Errors Before Court of Military Review at 232.

14. Third, appellant's evidence indicates that written religious materials were readily available for delivery to appellant by family members, but appellant was not allowed to receive them. Neither was he "allowed to have people administer to [him], come up and visit and administer to [him] in a pastoral sense." The military judge specifically inquired about these materials and their denial to appellant, as follows:

Q: What would you have needed to have practiced your religion? Are we talking primarily—the only thing that's really been mentioned here is reading material. Is that correct?

A: Materials to help me study, help me meditate and so forth. Help me with basic study for astrology and astronomy and herbalisms and stones. There's one book that covers all of this.

Q: Where was this book available? Did you have a copy?

A: I had a copy. It was brought up three times and each time it was brought up, it was given back to the person who brought it up. I even had the priest of my religion bring it up and they said no.

15. Fourth, the law is clear concerning reconciliation of a prisoner's First Amendment religious rights and the prison's security interests. A devotee of a nonconventional religion must be given "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972). Prison officials may impose only reasonable restrictions that are necessary for the operations and security of the prison. *Childs v. Duckworth,* 705 F.2d 915, 920 (7th Cir. 1983). Impingement upon a prisoner's First Amendment religious rights "must be carefully scrutinized to ascertain the extent to which [it is] necessary to effectuate the legitimate policies and goals of the corrections system. The two competing interests—the state's interest in the proper administration of the penal system and the prisoner's interest in his First Amendment right to adhere to the tenets of his faith—must be mutually accommodated." *Id.* at 920–21.

16. Finally, bringing all this into focus, the record of this proceeding establishes—just as one might suppose—that the confinement officials would have permitted appellant to have a Christian Bible had he wanted one. As the majority acknowledges, appellant's First Sergeant testified that the jailers' denial to appellant of Wiccan reading material was based entirely on their erroneous view

that Wicca "wasn't a recognized religious practice." ¶ 2.

## II

17. On the basis of the foregoing and contrary to the view of the majority, in my view appellant's evidence indicates that his First Amendment religious rights were violated in pretrial confinement. He is a member of a recognized religion. That religion uses an authoritative book which, contrary to the majority opinion, ¶ 9, is not blank at all but, rather, is hand copied from High Priestess to High Priestess and, in turn, hand copied by individual members, like appellant. While appellant legitimately may have been denied certain tools for ceremonial celebration of his religion (like the ritual knife), there was no reason at all, consistent with the state's interests in penal operations and security, to deny the religious book.

18. Simply stated, confinement officials were wrong when they concluded that Wicca was not a recognized religion, and they were wrong as well when they denied appellant his *Book of Shadows* so he could meditate on his religious beliefs. *See Cruz v. Beto* and *Childs v. Duckworth*, both *supra*. ¶ 15.

19. That being the case, it also seems clear to me that appellant's trial defense counsel dropped the ball, within the sense of the first prong of *Strickland v. Washington*, 466 U.S. 668, 687, 699, 104 S.Ct. 2052, 2070–71, 80 L.Ed.2d 674 (1984), when he unexplainably failed to furnish the military judge with authoritative bases for the Wicca religion, such as the Chaplains' Handbook, both versions of which apparently were readily available. *Cf. United States v. Scott*, 24 MJ 186 (CMA 1987)(ineffective assistance of counsel where defense attorney did not adequately investigate the case in preparation for trial). The majority's sheer *speculation* as to whether counsel uncovered the Chaplains' Handbook and, if so, as to why he did not produce it does not fill the *void* in the record. If the majority is unable to find a reasonable explanation on the face of the record, it should order a factfinding proceeding, *see United States v. DuBay*, 17 USCMA 147, 37 CMR 411 (1967), at which defense

counsel can be compelled to appear and to explain; it should not guess.

20. In any event, even that speculation is not persuasive. There is absolutely nothing in either version of the Chaplain's Handbook that is contrary to the legitimacy of Wicca as a religion or contrary to the efficacy of the *Book of Shadows* as a source of religious support for a Wiccan devotee. Regardless of any practical barriers to actual ceremonial celebration that might have been reflected in the handbooks, the law nonetheless mandates freedom to pursue religious beliefs to the extent practicable in the context of a prison environment. *Childs v. Duckworth, supra.* At a minimum, this meant permitting appellant access to his *Book of Shadows*. If counsel discovered the Chaplains' Handbook at all, he should have recognized the affirmative support that it lent to his client's cause in this regard.

21. The military judge gave counsel 48 hours from the end of the post-trial session to furnish him such material, and counsel repeatedly gave the military judge assurances that he would do so. Notwithstanding, the published essential findings of the military judge make it clear that he received no material from counsel: "[T]he defense has presented no evidence whatsoever, except for some sketchy testimony by the accused, concerning the nature of the Wiccan religion, its tenets and practices." As a direct result of counsel's failure, the military judge was led to conclude: "I am not convinced by the evidence that the Wiccan religion is in fact a 'religion,' . . . ." As now has been demonstrated, that was clearly erroneous.

## III

22. Had appellant sought relief from this unlawful denial of access to religious material by means of a *pretrial* Article 39(a) session and had defense counsel at such a session performed according to the standard, surely relief would have been afforded. There, he would have been required to show only that his religion was legitimate and that denial of his religious readings was not pursuant to any paramount interest of the state. When a pretrial confinee is suffering some particular

unlawful condition of confinement, his most effective relief—indeed, his *only* true "relief"—is to apply for a judicial order to lift the condition in issue.*

23. However, if a pretrial confinee suffers in silence and, instead, seeks an after-the-fact penalty credit on adjudged confinement as compensation for his suffering, as appellant has done, he must carry the additional burden of demonstrating that the condition was, in law, "punishment." *See* Art. 13, UCMJ, 10 USC § 813; *United States v. Huffman,* 40 MJ 225, 227–28 (CMA 1994). In *Huffman,* we stated: "While there is no single standard as to what constitutes 'punishment,' the Supreme Court has stated that one significant factor in that judicial calculus is the intent of the detention officials." *Id.* at 227; *accord United States v. Palmiter,* 20 MJ 90, 95 (CMA 1985)(Supreme Court has "decided that the question of whether particular conditions amount to punishment before trial is a matter of intent, . . . .").

24. In some cases, affirmative evidence of intent to punish via complained-of conditions may appear in the record. However, "in the absence of a showing of intent to punish, a court must look to see if a particular restriction or condition, which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective." *Id.* at 95, quoting *Bell v. Wolfish,* 441 U.S. 520, 539 n. 20, 99 S.Ct. 1861, 1874 n. 20, 60 L.Ed.2d 447 (1979). "[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment." *Bell v. Wolfish, supra* at 539, 99 S.Ct. at 1874.

25. Thus, the analytical construct: Look for evidence of an intent to punish—an unlawful, negative purpose for the condition; in the absence of such evidence, shift the focus and look for evidence that the condition serves "a legitimate nonpunitive governmental objective"—a lawful, positive purpose; and in the absence of the latter, a court may *infer* an intent to punish, even though actual evidence of such intent is not discernible.

26. The only evidence in this record would suggest that appellant was denied his *Book of Shadows* because the head jailer thought that Wicca was not a recognized religion and that, therefore, appellant was not entitled to the reading materials. Wrong? Yes. Evidence of a malicious intent to punish? Apparently not. Shifting the inquiry, it is clear to me on the other hand, based on the earlier discussion in this opinion, that denying appellant his *Book of Shadows* was *not* related to any legitimate governmental purpose.

27. Without more, an inference of purposeful punishment is permissible. Here, however, there is more: unrebutted evidence that the jailer denied the materials because of honest error. In the face of such evidence, the permissible inference of malintent does not seem appropriate. Indeed, the military judge's essential findings included this statement: "In any event, I find that deprivation of such materials was not intended by anyone . . . to be pretrial punishment." This finding of fact was based on the evidence and was not clearly erroneous, so we are bound by it.

28. Under these circumstances, I conclude that exclusion of appellant's religious material from jail was legally wrong but was not "punishment." The jailer's honest mistake would not have barred appellant from getting relief from the unlawful condition, but it is not sufficient basis to gain him *post facto* penalty credit on his adjudged confinement as compensation.

29. In that light, even if counsel had measured up by producing the materials necessary to persuade the military judge of the legitimacy of appellant's religion, any relief

---

* While in confinement, appellant complained of the repeated denial of access to his *Book of Shadows* both to confinement personnel and to representatives of his command. Yet, when he appeared for another purpose at a pretrial Article 39(a) session on October 16, 1991, the subject was not raised. This omission does not bar appellant from raising it subsequently at the trial level, as he has done, *see United States v. Huffman,* 40 MJ 225, 227 (CMA 1994). It is troublesome to me, however, that either appellant did not advise his counsel of the problem or counsel did not judicially pursue appellant's best remedy in the form of relief from the condition.

that the military judge might have granted would have been an erroneous windfall. *See Lockhart v. Fretwell,* —— U.S. ——, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Accordingly, while defense counsel fell short in his duty of effective representation, appellant suffered no prejudice thereby. On this basis, I join with the majority in affirming the decision below.

SULLIVAN, Chief Judge (dissenting):

I respectfully dissent.

30. I would hold that trial defense counsel was ineffective in the sentencing portion of the trial in failing to provide the Chaplain's Handbook and the Wiccan Bible after being given 48 hours by the judge to do so. Moreover, I would find that Specialist Phillips was prejudiced by counsel's incompetence because the military judge refused to find that deprivation of Wiccan religious materials amounted to pre-trial punishment. Having found that the defense counsel was ineffective here and that appellant was prejudiced by this, I would give relief under *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). For relief, I would award Specialist Phillips 142 days of confinement credit.

31. I am disappointed by the majority's analysis of this case. As I see it, this pre-punishment question does not turn on the benevolence or malfeasance of civilian jail officials' intent when they refused appellant access to Wiccan materials. Rather, the issue is whether jail officials quashed Specialist Phillips' rights under the First Amendment when they denied him access to a Wiccan Bible but offered him the option of a Christian Bible. As to that issue, I would find that Cumberland County jail officials violated Specialist Phillips' constitutional right to practice religion * under the Free Exercise Clause of the First Amendment. *See gener-*

ally *Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986).

32. Prisoners retain their right to practice their respective religions. *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). Moreover any rules limiting this right must relate to "legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987), and must treat people from traditional and non-traditional religious sects the same way. *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972). In particular, "the prison may not, because it is contemptuous or unreasonably fearful of a particular sect, place arbitrary obstacles in the way of inmates seeking to participate in the sect's modes of observance." *Johnson–Bey v. Lane,* 863 F.2d 1308, 1311 (7th Cir. 1988).

33. This record shows that Wiccan and non-Wiccan sect members were not treated the same way. I note that the military judge in the present case found "that the accused was denied access to materials concerning the Wiccan religion." Yet the record shows that the civilian jail officials sanctioned bible reading in their jail house. According to his First Sergeant:

Q Do you know anything about Phillips' religious practices?

A I remember one time when we were visiting him when he was in Cumberland County, he stated they wouldn't let him have his bible and some kind of religion that I'm not aware of and Captain—I think it was Captain Johnson, notified—talked to the head jailer there and the woman stated that it wasn't a recognized religious practice in the State of North Carolina and that he was more than welcome to have a

---

* Whether Wicca is a religion is not before this Court. I do note, however, that the Supreme Court evaluates whether the faith fills a place in the lives of its followers "parallel to that filled by the orthodox belief in God" as manifested in this country's mainstream religious sects. *United States v. Seeger,* 380 U.S. 163, 166, 85 S.Ct. 850, 854, 13 L.Ed.2d 733 (1965). At least one federal appellate court has applied that test and conclud- ed that "the Church of Wicca occupies a place in the lives of its members parallel to that of more conventional religions. Consequently, its doctrine must be considered a religion." *Dettmer v. Landon,* 799 F.2d 929, 932 (4th Cir. 1986), *cert. denied,* 483 U.S. 1007, 107 S.Ct. 3234, 97 L.Ed.2d 739 (1987). Based on the facts before me, I have no reason to disagree with the Fourth Circuit on this matter.

bible, but the one that he wanted, they wouldn't allow, no.

34. Thus, I look at this record and find a deprivation of a servicemember's constitutional rights. I cannot agree with the majority's view that the "military judge's findings of fact that there was no intentional punishment were not clearly erroneous." I am alarmed that this Court would choose to overlook denial of a First Amendment right because it can discern no ill will associated with its deprivation. Religious freedom is one of the cornerstones of our American heritage. No one should be denied this right; not even a non-Christian soldier sitting in a jail awaiting trial.